THOMPSON, Circuit Judge,
concurring.
The majority opinion accurately sets forth the applicable law and cogently explains why, given our standard of review, we cannot reverse the district court’s rejection of Dagoberto Sanchez’s Batson challenge. Therefore, I reluctantly concur in the majority’s result and reasoning. I write separately to point out that Sanchez’s Batson challenge has traveled an arduous route through the state and federal courts and because of that historical journey, I am left with a queasy confidence in the decision we reach today. Let me explain.
When defense counsel first raised a Bat-son challenge in state court way back in September of 2006, the trial judge was ready with an immediate (and inappropriate) response. Without asking for the prosecution’s justification, the judge gratuitously said in reference to the just-struck 19-year-old African American (Juror No. 261): “I think his youth and the fact that he’s a full-time college student could be a problem.” Sanchez v. Roden, 753 F.3d 279, 286-87 (1st Cir.2014). With that, the judge not only put words in the prosecutor’s mouth, but he also telegraphed what the court would consider to be acceptable, race-neutral reasons justifying the peremptory strike.
And it should come as no surprise that nearly eight years later, when finally called upon to explain why he struck this particular juror, the prosecutor seized upon the juror’s “youth.” In doing so, the prosecutor did nothing more than parrot back the trial judge’s unprompted suggestion.
How well this case illustrates the Massachusetts Supreme Judicial Court’s warning that a trial judge who offers up his own reason for a prosecutor’s peremptory *94 strike “risks assuming the role of the prosecutor.” Commonwealth v. Fryar, 414 Mass. 732, 610 N.E.2d 903, 908 (1993). It takes no great amount of thought to conclude that, had the trial judge required a contemporaneous explanation for the prosecutor’s strikes, my trust in having reached the correct outcome (whichever way it went) would be greatly increased. Unfortunately, we will never know what the prosecutor would have said in September 2006 had the trial judge not erred in his application of the Supreme Court’s Batson protocol. As a result, there will always be a nagging question in my mind as to whether structural error occurred at Sanchez’s trial which has not been detected or corrected. Cf. Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (recognizing the trial court’s “pivotal role in evaluating Batson claims” because “‘the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge’ ” (alteration in original) (quoting Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion))).
Now, Sanchez’s habeas petition was essentially doomed when, following the district court’s evidentiary hearing, the district judge “found [the prosecutor’s testimony] to be credible in all respects.” Sanchez v. Roden, No. 12-cv-10931-FDS, 2015 WL 461917, at *7 (D.Mass. Feb. 4, 2015). And why did the judge believe the prosecutor’s adoption of the trial judge’s suggestion explained his peremptory challenges? Because “[h]is demeanor was professional and credible throughout” the proceeding. Id. Through this observation, the judge effectively said that he found a professional to be professional. But again, what else would be expected when the prosecutor went into the hearing not only having had almost eight years to consider what he would say, but also with the awareness of what the state trial judge considered to be a perfectly valid and acceptable justification for the strike?
To be sure, the district judge also noted that the prosecutor’s testimony “was based in part on memory and in part on his routine empanelment practices, and [that] he endeavored to distinguish between the two as he testified.” Id. He also gave a nod to defense counsel’s “extensive cross-examination” of the prosecutor. Id. These factors, it appears, must have played contributory roles in the overall finding of credibility.
But the prosecutor’s testimony was not exactly monolithic. On direct, he explained why he accepted Juror No. 243, the 21-year-old white college student from Russia, but not Juror No. 261, the 19-year-old black college student from Boston:
I go through those [juror] questionnaires to determine how many of the remaining challenges I’m likely to have to use, and in that particular instance, I took him, despite not wanting to take him, but I was-there are a number of young jurors who I will take based upon what I consider to be indications on their questionnaire that might make them not fit their chronological age, which is to say that he was 21 years old, but I noted he was born in Moscow, I noted that he came here on his own to begin his own education, and so I thought if I had to take a young juror, that would be somebody who might be a better candidate than most.
Thus, the reason given for accepting one young college student while striking the other is that there was something “more” (my word, not the prosecutor’s) in the white juror’s questionnaire' — and which was absent from the young black man’s— *95 that led the prosecutor to believe Juror No. 243 might be more mature than he would expect other 21-year-olds to be. As it turns out, the prosecutor’s unequivocal testimony about this “more” — that the questionnaire told him Juror No. 243 traveled to the United States “on his own to begin his own education” — did not hold up on cross-examination.
After confirming that the white 21-year-old had been born in Moscow, Russia (as opposed to Moscow, Maine) the prosecutor had the following exchange with Sanchez’s counsel:
Q. Okay. This is somebody who wouldn’t have the same experience with our system of law as other' citizens?
A. I don’t know. All I know is that he was born in another country and was attending school in the United States.
Q. Okay. And what about that did you find beneficial? Was there something about him that overcame the fact that he was young?
A. Barely, yes. The fact that I was down to six challenges and looking at him, my inclination was to strike him, but was there anything specifically that said to me, [’]oh, I want this person,[’] not that I can remember. It was more of a hold-your-nose situation and take him because I thought somebody who came to this country to go to school at the age of 21 may have been chronologically a little bit older than someone else in terms of life experiences, and that’s really what I’m looking at that somebody who has some level of maturity and life experience.
The prosecutor initially stood strong and maintained the position he took on direct, namely, that Juror No. 243 came to the United States on his own to attend college. But the very next exchange opened up a chink in the foundation:
Q. Well, he couldn’t have come here to go to school, he had to be a citizen [to serve on the jury], correct?
A. I didn’t mean that I knew his life history. I knew he was 21, and I knew that he was here attending school and he was born in another country.
This next colloquy brought the testimonial edifice tumbling down:
Q. The fact that the man was born in Russia, you don’t know whether he came here at six days old, six months old, six, sixteen years old; you have no idea?
A. Correct, absolutely no idea.
So much for the prosecutor’s professed belief that Juror 243 might be more mature than other 21-year-olds as a result of his having come to the United States on his own to further his education.
Nevertheless, seizing on this about-face to reject the district judge’s credibility determination would overlook the fact that the prosecutor actually gave another reason for believing this particular 21-year-old might be more mature than his chronological age would generally indicate. After all, the prosecutor also said that he relied on the fact that the prospective juror had been “born in Moscow.” Cross-examination did not substantially undercut this second reason. Indeed, he explained, “I thought somebody who came to this country to go to school at the age of 21 may have been chronologically a little bit older than someone else in terms of life experiences, and that’s really what I’m looking at that somebody who has some level of maturity and life experience.”
That Juror No. 243 was born in Moscow, Russia is uncontested on this record. And it’s a fact that technically differentiates ■Juror No. 243 from Juror No. 261, who was born in the Boston area. Whether this ostensibly race-neutral fact[6] — as op *96 posed to one being white and the other black — explains the prosecutor’s exercise of his peremptory challenges depends entirely on the credibility of the prosecutor’s testimony. The district judge, after hearing his testimony on direct and cross-examination, found it credible and determined that the prosecutor did not strike Juror No. 261 on account of his race.
This case is devoid of extrinsic evidence of racial discrimination. We do not, for example, have trial notes from the prosecutor indicating that race played a role in jury selection. We do not have evidence that the prosecutor manipulated trial procedures in an attempt to influence the racial makeup of the jury. See, e.g., Miller-El v. Dretke, 545 U.S. 281, 253-55, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (commenting on the prosecutor’s use of a “jury shuffle” to keep black members of the venire at the back of the line). Nor is there evidence of a longstanding tradition of racial discrimination .in the use of peremptory challenges in the prosecutor’s office,[7] or evidence that prosecutors were encouraged to exercise peremptories so as to keep minorities off the jury. See id. at 263-66, 125 S.Ct. 2317 (taking into account a particular county’s “specific policy of systematically excluding blacks from juries,” id. at 263, 125 S.Ct. 2317). And nothing in the record clearly demonstrates that the prosecutor’s proffered reason for accepting Juror No. 243 but not Juror No. 261 was pretextual. See id. at 240-52, 255-63, 125 S.Ct. 2317 (comparing the prosecution’s treatment and questioning of black versus white venire members at voir dire and concluding that “the implication of race in the prosecutors’ choice of questioning cannot be explained away,” id. at 263, 125 S.Ct. 2317); see also Snyder, 552 U.S. at 485, 128 S.Ct. 1203 (concluding that the justification offered by the prosecutor was pretextual after conducting a comparative juror analysis).
In sum, whether the prosecutor’s strike of Juror' No. 261 violated Batson comes down entirely to his credibility in explaining his strikes that day and, in particular, why he did not challenge Juror No. 243. We have said time and time again that making credibility determinations is a job for the district court, not something for us to do looking at a cold record. Absent other evidence in the record pointing to racial discrimination, we simply cannot say that the district judge clearly erred in accepting the prosecutor’s explanation and upholding the peremptory challenge. This holds true even if any one (or all) of us, sitting as the trial judge, might have reached a contrary conclusion.
Finally, because a trial judge faced with a Batson challenge must consider the to *97 tality of the circumstances, it is appropriate for us to acknowledge them here. Although we are unable to say the district judge clearly erred in finding that the prosecutor’s strike was not motivated by Juror No. 261’s race, the end result is that all young, black men and young men of, color in the venire — indeed all those who resembled Dagoberto Sanchez — found themselves dismissed at the behest of their own government. No other group of prospective jurors received such treatment.
The facts in this record certainly raise the judicial antennae. But given the standard of review, I can do no more than register my discomfort at having to affirm the denial of habeas relief even though the best evidence as to whether or not a Bat-son violation occurred — the prosecutor’s contemporaneous explanation — has been irretrievably lost to us.

. Presumably, place of birth would only make a difference if the individual lived there be *96 yond his or her early childhood. Had Juror No. 243 moved from Russia to the United States when he was, say, two years old, there is no reason at all to believe that his Russian birthplace could render him more mature than his chronological age or distinguish him from Juror No. 261. The prosecutor admitted, of course, that he has "no idea” how long Juror No. 243 lived in Russia. But, as the majority opinion correctly points out, under Batson the reason for a peremptory strike need not be correct, persuasive or even plausible, so long as it is race neutral. Moreover, once a race-neutral reason is advanced, the peremptory challenge will be allowed so long as the trial judge is convinced that the challenging party provided the real motivation for the strike, and that the reason was not offered merely to camouflage racial discrimination. Thus, what is important for our purposes here is not whether a young man who happened to have been born in Moscow is more mature than other young men of his age who had been bom in Boston, but whether the prosecutor genuinely believed that to be possible. And the district judge found that he did.

. Although counsel has represented that this has been a problem in Suffolk County, the arguments of counsel are not evidence.